UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SEQUOYAH OZOROWSKY,

    Plaintiff,

v.                    Case No. 8:20-cv-2564-VMC-AEP

BAYFRONT HMA HEALTHCARE
HOLDINGS, LLC,

    Defendant.
_____/

**ORDER**

    This matter comes before the Court upon consideration of Defendant Bayfront HMA Healthcare Holdings, LLC's Motion for Summary Judgment (Doc. # 48), filed on June 1, 2021, and Plaintiff Sequoyah Ozorowsky's Motion for Partial Summary Judgment (Doc. # 52), filed on June 2, 2021. The Motions have been fully briefed. (Doc. ## 54, 55, 56, 57). For the reasons that follow, both Motions are denied.

**I.**   **Background**

    Ozorowsky began working at Bayfront's hospital in St. Petersburg, Florida, as a full-time patient access services representative (PASR) on January 28, 2019. (Pl. Dep. Doc. # 52-3 at 18:22-19:2, 22:24-23:3; Arbogast Decl. Doc. # 49-8 at ¶ 4). This was a full-time position during the night shift of Bayfront's emergency room. (Pl. Dep. Doc. # 52-3 at 28:21-

29:9; Pl. Decl. Doc. # 54-3 at ¶ 3). "PASRs are the first persons patients see, and their job involves taking patients' information and processing their intake paperwork, including insurance." (Arbogast Decl. Doc. # 49-8 at ¶ 12). "Bayfront is always hiring for PASR positions" as the position is "entry-level" and "has a high level of turnover." (Id.).

A few months later in either March or April of 2019, Ozorowsky enlisted in the U.S. Army Reserve. (Id. at ¶ 5; Pl. Decl. Doc. # 54-3 at ¶ 4). Ozorowsky "reported to Kathy Delon, [his] direct supervisor, and Kimberlykae Williams, her supervisor, that [he] had enlisted in the Reserves and would report to basic training in May 2019." (Pl. Decl. Doc. # 54-3 at ¶ 5). The orders listed Ozorowsky's basic training start date as May 17 with a ship date of May 6 and noted that training would last fourteen weeks. (Arbogast Decl. Doc. # 49-8 at Ex. 1). When he handed them a copy of his orders, "Delon said that [Ozorowsky] would have to resign and [] Williams stated that she would not hold [his] job for [him] that long (14 weeks)." (Pl. Decl. Doc. # 54-3 at ¶ 5).

Ozorowsky contacted Laurie Sparr in HR because he "knew this to be a violation of law." (Id. at ¶ 6). Sparr "would not tell [Ozorowsky] that [his] job was protected," instead saying that "she would look into it over the weekend." (Id.;

2

Pl. Dep. Doc. # 52-3 at 177:11-16). Because he considered Sparr's response unsatisfactory, he contacted his Army recruiter who then, on April 5, 2019, sent Sparr a Uniformed Servicemembers Employment and Reemployment Rights Act (USERRA) flyer and asked Sparr to let him know if she had "any questions or concerns." (Id. at 177:8-178:1; Doc. # 52-2 at Ex. 3). Ozorowsky avers that he specifically asked the Army recruiter "to send [] Sparr a copy of the law informing her that [his] job is protected." (Pl. Decl. Doc. # 54-3 at ¶ 6).

Delon later emailed Ozorowsky on April 7, 2019, that she had previously "misinformed" him and, after having spoken to HR, she confirmed that Ozorowsky was "protected" by USERRA. (Doc. # 49-8 at Ex. 3). Yet, a few weeks later on April 22, 2019, Williams emailed HR the following message, in relevant part: "Can someone explain why an employee who is within their 90-day introductory period can go an[d] enlist in the military and the employer is obligated to protect their job. Is there a Florida statutes on this that you can send me to review?" (Doc. # 49-8 at Ex. 3). Later in the email thread, Jim Reames, who was HR Director at the time, responded to Williams: "Yes, he is entitled to his position when his training is completed. It's federal law." (Doc. # 52-2 at Ex. 4).

3

According to Lee Ann Arbogast, who subsequently became HR Director, Bayfront approved Ozorowsky's request for a USERRA military leave of absence (LOA) in full with the fourteen weeks of training expiring on August 23, 2019. (Arbogast Decl. Doc. # 49-8 at ¶¶ 9, 11). Based on an April 26, 2019 email, Williams spoke with Ozorowsky and confirmed that Bayfront had approved his request for "14+ weeks" of LOA, and that his last day of work would be May 1, 2019. (Doc. # 49-10). However, "[b]efore [Ozorowsky] left for training in May 2019, [his] new supervisor, [Patient Access Director] Drew Sandt, sent [Ozorowsky] an email with directions for requesting [his] military leave through FMLA One Source," and Ozorowsky did so. (Pl. Decl. Doc. # 54-3 at ¶ 8). The One Source paperwork reflects that Ozorowsky was only approved for leave through August 7, 2019, which is less than fourteen weeks from the start of his training on May 17, 2019. (Doc. # 52-2 at Ex. 5).

Ozorowsky left for basic training as scheduled. While in training, Ozorowsky sustained stress fractures in both of his legs. (Pl. Decl. Doc. # 54-3 at ¶ 9). The Army treated Ozorowsky's injuries and, as of August 23, 2019, the Army was still treating him.

4

On August 24, 2019 — the day after his approved leave term ended — Sandt called Ozorowsky and left him a voicemail. (Doc. # 49-6; Sandt Dep. Doc. # 49-7 at 19:12-16, 34:3-9). According to an imperfect voice-to-text version of the voicemail that Ozorowsky saved, Sandt said:

> Hey [S]equoia this is Drew calling you from Bay Front Saint Petersburg. I am I know at the time that you had left for your 14 week orders. Kim Williams was currently in place. I am the current director here for a little bit before you left as well but just calling to see your status on when you'll be back or if you'll be back but if you have any updates for us you can give me a call [].

(Doc. # 49-6). Ozorowsky called Sandt back a few days later and told him "that [he] had been injured at basic training and would need more time before [he] would be released from the Army." (Pl. Decl. Doc. # 54-3 at ¶ 10; Pl. Dep. Doc. # 52-3 at 62:13-20, 63:12-19).

Sandt then called Ozorowsky back on August 29, 2019. (Pl. Decl. Doc. # 54-3 at ¶ 11). Based on the voice-to-text message saved by Ozorowsky, Sandt said that he was sorry Ozorowsky was injured and continued:

> I spoke with HR and they wanted us to just reach out and let you know that when you're better and you're home please reach out to us and let us know and you're welcome to reapply for a position however the time off that we agree[d] to has expired. So now we're going to proceed with interviewing some other candidates for this position so if you have any questions you feel free

> to give me a call or when you're back and you wanna
> reach out to us and let us know that you're back
> we'll see what positions we have open. If you have
> any questions give me a call thanks bye.

(Doc. # 49-5; Sandt Dep. Doc. # 49-7 at 36:5-15).

"On August 30, 2019, the Army discharged [Ozorowsky] because of [his] medical condition." (Pl. Decl. Doc. # 54-3 at ¶ 12). Ozorowsky's release papers from the Army state that Ozorowsky was discharged because of a "condition, not a disability." (Arbogast Decl. Doc. # 49-8 at Ex. 5). His stress fractures make it difficult for Ozorowsky to walk long distances. (Pl. Dep. Doc. # 52-3 at 7:18-22). But at the time he was discharged, Ozorowsky did not have any physician's restrictions based on the injury, was not using crutches, and could perform his PASR job. (Id. at 11:24-12:2, 12:14-19, 19:6-8, 34:7-10, 35:5-18).

According to his declaration, Ozorowsky went to Bayfront a few days later on September 3, 2019, and "asserted [his] USERRA rights" to Sparr in HR by "handing her a copy of [his] DD214 [release papers]" and saying that he "was back from training and ready to start work again." (Pl. Decl. Doc. # 54-3 at ¶ 13). But Sparr "stated that she would have to get with [Sandt] [and] refused to tell [Ozorowsky] that [he] would be returned to work." (Id.). Ozorowsky further avers that

"[b]etween September 3, 2019 and September 12, 2019, [he] returned to Bayfront and left countless un-returned messages for [] Sparr telling her that [he] wanted [his] job back." (Pl. Decl. Doc. # 54-3 at ¶ 14). Sparr advised Ozorowsky to speak with Arbogast, who had since started as HR Director, and Sandt in person concerning his employment. (Doc. # 49-13).

Finally, on September 12, 2019, Ozorowsky attended a meeting with Sandt and Arbogast. The parties' versions of this meeting conflict. According to Arbogast, Ozorowsky said "that he had a knee injury during basic training and needed more time off to treat his injury" and Arbogast "approved [] Ozorowsky's request for additional time off." (Arbogast Decl. Doc. # 49-8 at ¶ 13). "Ozorowsky, [] Sandt, and [Arbogast] agreed that [] Ozorowsky would let [Bayfront] know when he was ready to return to work and what jobs he wanted to do upon his return." (Id.). She also testified that Ozorowsky was limping during the September 12 meeting. (Arbogast Dep. Doc. # 55-2 at 29:11-12). Sandt's version of events largely matches Arbogast's. (Sandt Dep. Doc. # 49-7 at 19:24-20:2, 53:17-55:7). He testified that Arbogast had provided Ozorowsky a list of available positions with Bayfront and told him to apply for any position he was qualified for once

he was ready to return to work. (<u>Id.</u> at 21:20-22:17, 36:13-18, 53:17-55:7).

But, according to Ozorowsky, he did not ask for additional time off during the September 12 meeting, even though he did tell Arbogast that he had been injured during training. (Pl. Decl. Doc. # 54-3 at ¶ 15; Pl. Dep. Doc. # 52-3 at 62:3-11). Rather, he testified that he was willing and able to return to work, but Arbogast told him Bayfront had not held his position open so he could apply for vacancies as an internal employee instead. (Pl. Dep. Doc. # 52-3 at 38:9-19). Arbogast did not offer any PASR positions to him during this meeting. (<u>Id.</u> at 39:18-20). Instead, Ozorowsky testified Arbogast offered him several nursing positions, but he was not a nurse. (<u>Id.</u> at 38:13-15, 39:14-17). Although Ozorowsky testified in his deposition that he did not make any complaints to anyone at Bayfront about alleged violations of USERRA (<u>Id.</u> at 167:19-168:1, 168:10-12), he states in his declaration that he told Arbogast during this meeting "that [he] had the right to [his] job under USERRA." (Pl. Decl. Doc. # 54-3 at ¶ 15). But he never said that he could not perform the functions of his job because of his injury. (Pl. Dep. Doc. # 52-3 at 80:9-15). Ozorowsky also testified that he never asked for an accommodation for his injury from anyone

8

at Bayfront because he "was not given the opportunity." (Id. at 194:3-5).

Months passed. Ozorowsky eventually "complained to Employer Support of the Guard and Reserve (ESGR) who assigned [him] an ombudsman to handle [his] case." (Pl. Decl. Doc. # 54-3 at ¶ 16). The ESGR ombudsman, Lenny Miller, called Arbogast on November 25, 2019, reporting that "Ozorowsky had filed a USERRA claim against Bayfront and wanted Bayfront to pay his rent and get his car back from repossession." (Arbogast Decl. Doc. # 49-8 at ¶ 14). According to her declaration, Arbogast "explained to [] Miller that [] Ozorowsky had previously communicated that he was not ready to return to work, but if he was, that Bayfront had several PASR positions available and he would be placed in any of them as soon as he wanted." (Id.).

Ozorowsky then emailed Arbogast on December 2 and December 4, 2019. (Id. at ¶ 15; Pl. Decl. Doc. # 54-3 at ¶ 16). On December 4, 2019, Arbogast emailed Ozorowsky the following:

> Thank you for reaching out and I appreciate the opportunity to discuss your continued employment with Bayfront Health.
>
> Our recollection of our meeting is a little different. I believe when you, Drew and I met, you indicated you were unable to return to work due to

your knee injury and needed more time off. We agreed to provide you with that opportunity and to this day you have remained an employee of Bayfront Health St. Petersburg in a Leave of Absence status.

Additionally, we discussed an expectation of you letting me know which opportunities interested you. We currently have two full-time Patient access roles available:

Patient Access Services Representative (Registrar) - Cardiology Clinic - FT

Patient Access Services Representative (Registrar) - OB/GYN Clinic - FT, Days

And if you are not ready to return to a full-time schedule, we also have other Patient Access positions to choose from:

Patient Access Services Representative (Registrar) - Emergency - PRN, Rotating shifts and weekends

Patient Access Services Representative (Registrar) - Emergency - PRN, Rotating shifts and weekends

Patient Access Services Representative (Registrar) - Medical Plaza - Part Time, (5 AM-10 AM, M-F)

I am happy to discuss any of the above with you. Additionally, there are a number of other roles for which we are hiring and you are welcome to consider them as well, so long as you meet the minimum expectation requirements.

(Doc. # 49-2 at 2).

Indeed, Ozorowsky admits that "at some point in December, [he] was offered to apply for multiple jobs at Bayfront" but, according to his declaration, "[n]one of these jobs was in the ER on nightshift." (Pl. Decl. Doc. # 54-3 at ¶ 17). "Nightshift paid more and allowed [him] the opportunity to attend school during the day." (Id.). He also testified

that the positions Arbogast offered him on December 4 had "different roles and responsibilities than what [a PASR] has for the ER." (Pl. Dep. Doc. # 52-3 at 111:20-112:3).

Yet, according to Arbogast, "[r]egardless of the job location/department or the shift [], full-time PASR positions offer the same opportunities for advancement, general working conditions, rank and responsibility." (Arbogast Decl. Doc. # 49-8 at ¶ 16). There were no vacant full-time, nightshift PASR positions in the ER between September 12, 2019, and December 4, 2019, because "no full-time nighttime Emergency Department positions were necessary to meet Bayfront's staffing and business needs at that time." (Trigg Decl. Doc. # 51-1 at ¶¶ 5-6).

"After December 4, 2019, [Arbogast] never heard again from [] Ozorowsky." (Arbogast Decl. Doc. # 49-8 at ¶ 15). "Ozorowsky remained a Bayfront employee in a [LOA] status for 10 more months, until September 30, 2020, after which Bayfront was sold on October 1, 2020." (Arbogast Decl. Doc. # 49-8 at ¶ 17). "At that point, [Bayfront] had to administratively remove [Ozorowsky] from payroll as all employees were terminated from Bayfront upon the sale." (Id.). Between December 4, 2019, and the sale of Bayfront in late 2020, "twenty-six (26) [PASR] positions were vacant at Bayfront and

11

posted on [the] Bayfront website," including "ten (10) full-time positions in the Emergency Department, including those that had a nighttime schedule." (Trigg Decl. Doc. # 49-9 at ¶¶ 7-8).

Ozorowsky initiated this action against Bayfront on November 2, 2020. (Doc. # 1). He filed an amended complaint on January 8, 2021, asserting claims for: failure to reemploy in violation of the Uniformed Servicemembers Employment and Reemployment Rights Act (USERRA) (Count I); discrimination in violation of USERRA (Count II); retaliation in violation of USERRA (Count III); disability discrimination under the Americans with Disabilities Act (ADA) (Count IV); disability discrimination under the Florida Civil Rights Act (FCRA) (Count V); retaliation under the ADA (Count VI); retaliation under the FCRA (Count VII); and violation of Florida's Private Sector Whistleblower Act (FWA) (Count VIII). (Doc. # 26). Bayfront filed its answer on January 22, 2021. (Doc. # 27). The case proceeded through discovery.

Now, each party moves for summary judgment on liability. (Doc. ## 48, 52). The Motions are briefed and ripe for review. (Doc. ## 54-57).

## II.   **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the

pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of

14

establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

## III. **Analysis**

### A. **Bayfront's Motion**

Bayfront seeks summary judgment on all Ozorowsky's claims.

#### 1.   **Admissions in Amended Complaint**

As a preliminary matter, the Court addresses Bayfront's argument that Ozorowsky admitted in his amended complaint that he requested an extended leave of absence in September 2019. (Doc. # 48 at 15-16; Doc. # 56 at 4-6). Bayfront argues the amended complaint's allegations conflict with Ozorowsky's testimony and, thus, the amended complaint's allegations should control.

The Court disagrees. The amended complaint's allegations do not conflict with Ozorowsky's deposition testimony.

Rather, the amended complaint makes clear that Ozorowsky requested to "extend[] his leave" on August 24, 2019 "to treat for his injury and until the Army released him." (Doc. # 26 at ¶¶ 23-24). Nowhere does the amended complaint allege that Ozorowsky requested an extended leave because of his injury after the Army released him on August 30, 2019.

Thus, the amended complaint does not preclude Ozorowsky from proceeding on the theory that — although he had said he needed longer leave during the August 24 phone call to Sandt — he was ready and willing to return to work at Bayfront in September 2019 and told Bayfront employees as much.

### 2.   Failure to Reemploy and Discrimination under USERRA

In Count I, Ozorowsky asserts a claim for failure to reemploy under USERRA. In Count II, Ozorowsky asserts a claim for discrimination in violation of USERRA.

"Congress enacted USERRA to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service and to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers." Dees v. Hyundai Motor Mfg. Alabama, LLC, 368 F. App'x 49, 50-51 (11th Cir.

2010)(citation and internal quotation marks omitted). "Under the USERRA, a person who is a member of or who has performed in a uniformed service shall not be denied 'initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership' or performance of service." Ward v. United Parcel Serv., 580 F. App'x 735, 737–38 (11th Cir. 2014)(quoting 38 U.S.C. § 4311(a)).

"An employer, therefore, violates the USERRA where the employee's membership or service in the uniformed services is a 'motivating factor' in the employer's failure to reemploy the individual." Id. at 738. "To establish a prima facie case of discrimination under the USERRA, the plaintiff must demonstrate by a preponderance of the evidence that his military membership or service was a motivating factor in the employer's decision." Id. (citation omitted). "A motivating factor does not necessarily have to be the sole cause for the employer's decision, but is defined as one of the factors that a truthful employer would list as its reasons for its decision." Id. "A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the

proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees." Id.

Regarding the requirements of reemployment, USERRA provides for an "escalator principle" which "requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service." 20 C.F.R. § 1002.191. "Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position." Id. "The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle." 20 C.F.R. § 1002.194. In this way, "USERRA accommodates the fact that workplaces are dynamic and not static; changes occur over time that impact the positions to which service members are entitled to reemployment." Weaver v. Madison City Bd. of Educ., No. 5:11-

CV-03558-TMP, 2016 WL 7210447, at *12 (N.D. Ala. Dec. 13, 2016).

Bayfront argues that summary judgment should be granted on these claims because Ozorowsky was not ready to return to work in September 2019 and Bayfront offered him at least two similar full-time PASR positions in December 2019, for which Ozorowsky never applied. (Doc. # 48 at 21). Bayfront also argues that there is no evidence that Ozorowsky's not returning to work after his military leave was in any way caused by discriminatory animus. (Id. at 23-26).

The Motion is denied as to these claims. Notably, there are genuine disputes of material fact regarding Bayfront's attitude toward Ozorowsky's taking leave and what occurred during the September 12 meeting between Ozorowsky and Arbogast and Sandt. Taking the evidence in the light most favorable to Ozorowsky, Bayfront was displeased with Ozorowsky's taking military leave, as demonstrated by the tone of Williams' April 22, 2019 email and one possible interpretation of Sandt's August 29 voicemail in which he informed Ozorowsky that Bayfront would be interviewing other people to fill his PASR position. (Doc. # 49-8 at Ex. 3; Doc. # 49-5). When Ozorowsky returned from leave, he visited Bayfront on multiple days in early September asking to be

19

reemployed. He did not get a meeting until days later on September 12 — the meeting with Arbogast and Sandt. According to Ozorowsky, he asked to be reemployed immediately during this meeting at which time Arbogast advised Ozorowsky to look up available positions himself and then apply for an opening as his original position was no longer available.

But, Ozorowsky testified, Arbogast only offered him nursing positions for which he was not qualified at that time. (Pl. Dep. Doc. # 52-3 at 38:13-15, 39:14-17). Thus, accepting Ozorowsky's version of events, Bayfront did not offer to reemploy him in an equivalent position in September 2019. Additionally, as to the two full-time PASR positions that were available in December 2019, Ozorowsky averred that these positions were not equivalent to the position he held before his military leave because they paid less and had "different roles and responsibilities," such that a reasonable jury could conclude these positions did not satisfy the escalator principle. (Pl. Decl. Doc. # 54-3 at ¶ 17; Pl. Dep. Doc. # 52-3 at 111:20-112:3).

Regardless of whether equivalent PASR positions became available in the months that followed, a reasonable jury could conclude at least that Bayfront violated USERRA in September 2019 when it did not reemploy Ozorowsky according to the

20

escalator principle. Additionally, the fact that Ozorowsky was not officially terminated until September 2020 when Bayfront was sold does not preclude Ozorowsky from establishing an adverse action based on his unpaid leave of absence (LOA) status. Indeed, Bayfront concedes that "an unpaid LOA may constitute an adverse action under appropriate circumstances." (Doc. # 48 at 24 n.37).

Bayfront's argument regarding pretext, which focuses on its version of events in which Ozorowsky requested additional time off during the September 12 meeting (Id. at 29), are unavailing as there is a genuine dispute over what was said during that meeting. Likewise, given the genuine disputes over how events unfolded, the Court rejects Bayfront's contention that summary judgment should be granted in its favor regarding Ozorowsky's claim for liquidated damages. (Doc. # 48 at 29 n.43).

Ozorowsky's USERRA failure to reemploy and discrimination claims survive summary judgment.

### 3.   <u>Retaliation under USERRA</u>

Next, in Count III, Ozorowsky asserts a claim for retaliation in violation of USERRA.

"The USERRA prohibits an employer from taking an adverse employment action against employees who seek to enforce the

Act's protections." Ward, 580 F. App'x at 739 (citing 38 U.S.C. § 4311(b)). "An employer engages in prohibited retaliatory conduct where it takes an adverse action against an employee motivated by that employee's efforts to enforce the USERRA, unless the employer can prove that the action would have been taken in the absence of the employee's protected activity." Id.

"In the context of employment retaliation cases, a plaintiff's burden to prove causation can be met by showing a close temporal proximity between the statutorily protected activity and adverse-employment action." Id. (citation omitted). "Where there was a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." Id.

Bayfront argues that summary judgment should be granted on this claim because (1) "Ozorowsky cannot prove an adverse act of failure to reemploy" because he requested additional leave during the September 12 meeting and failed to accept the PASR positions he was offered in December 2019; and (2) concerning his September 2020 separation of employment, "he cannot show Bayfront was motivated in its actions by any

22

alleged efforts by him to enforce USERRA." (Doc. # 48 at 26-28).

Regarding the first argument, there is a genuine dispute over whether Ozorowsky asked for additional leave during the September 12 meeting. Accepting his testimony that he did not request additional leave, a reasonable jury could conclude that Arbogast and Sandt failed to reemploy Ozorowsky at that time. Additionally, as previously discussed, accepting Ozorowsky's testimony and declaration, the PASR positions he was offered in December 2019 were not equivalent to his previous position.

Bayfront's second argument concerns the element of causation, focusing on the ten to eleven months between Ozorowsky's various protected activities of asserting his USERRA rights and complaining to his ESGR ombudsman and his separation from employment in September 2020 when Bayfront was sold. (Doc. # 48 at 27). True, the time delay between Ozorowsky's protected activity and his ultimate separation from employment with Bayfront in September 2020 is insufficient to establish a prima facie case of causation.

But, again, "an unpaid LOA may constitute an adverse action under appropriate circumstances." (Doc. # 48 at 24 n.37). And, taking the evidence in the light most favorable

to Ozorowsky, Bayfront engaged in an adverse action when in September 2019 it left Ozorowsky on unpaid LOA status despite his request to be reemployed. This action occurred five months after Ozorowsky first requested his Army recruiter contact Bayfront about his USERRA rights and a little over a week after Ozorowsky "asserted" his USERRA rights to Sparr and demanded his job back. (Pl. Dep. Doc. # 52-3 at 177:8-178:1; Doc. # 52-2 at Ex. 3; Pl. Decl. Doc. # 54-3 at ¶ 13). This is sufficient to establish causation for his prima facie case.

As with Bayfront's USERRA discrimination and failure to reemploy claims, Bayfront's argument regarding pretext, which focuses on its version of events for the September 12 meeting (Doc. # 48 at 29), is unavailing. There is a genuine dispute over whether Ozorowsky requested additional time off during that meeting. The Motion is denied as to Count III.

### 4.    Disability Discrimination

In Counts IV and V, Ozorowsky asserts claims for disability discrimination in violation of the ADA and FCRA. Bayfront argues that summary judgment should be granted on these claims for numerous reasons.

"The burden-shifting analysis of Title VII employment discrimination claims" — as established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) — "is applicable to ADA

claims." <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000). To succeed on a disability discrimination claim, a plaintiff must show as part of his prima facie case that: "(1) he is disabled; (2) he was a qualified individual at the relevant time . . . ; and (3) he was discriminated against [] because of his disability." <u>Scott v. Shoe Show, Inc.</u>, 38 F. Supp. 3d 1343, 1359 (N.D. Ga. 2014)(citation omitted); <u>D'Onofrio v. Costco Wholesale Corp.</u>, 964 F.3d 1014, 1021 (11th Cir. 2020)("Given the parallel structure of the statutes, this Court analyzes state-law disability discrimination claims under the FCRA using the same framework as it does for claims made under the federal [ADA]."). "If the employee is able to establish his *prima facie* case, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason" for the adverse action. <u>Alvarez v. Sch. Bd. of Broward Cnty.</u>, 208 F. Supp. 3d 1281, 1285 (S.D. Fla. 2016). At that point, the burden shifts back to the plaintiff on the issue of pretext.

Bayfront argues that Ozorowsky is not disabled as a matter of law and that he also cannot establish a failure to accommodate claim under the ADA. (Doc. # 48 at 11, 15). In his response, Ozorowsky fails to respond to these arguments, instead arguing only that Ozorowsky was regarded as disabled

by Bayfront. (Doc. # 54 at 11-12). Thus, Ozorowsky has abandoned any argument that he is actually disabled or that Bayfront failed to accommodate him. See Powell v. Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014)("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

The Court need only address Bayfront's "regarded as disabled" argument. "For a plaintiff to prevail under the 'regarded as' theory of disability, [he] must establish two points: (1) that the perceived disability involves a major life activity, and (2) that the perceived disability is 'substantially limiting' and significant." Luna v. Walgreen Co., 347 F. App'x 469, 471 (11th Cir. 2009).

Bayfront argues that "there is no evidence Arbogast or Sandt perceived [Ozorowsky] as disabled, or that the perceived disability involved a major life activity or was substantially limiting." (Doc. # 48 at 13). The Court disagrees. Arbogast testified in her deposition that Ozorowsky was limping during the September 12 meeting.

26

(Arbogast Dep. Doc. # 55-2 at 29:11-12). In his August 29 voicemail, Sandt stated that, because Ozorowsky was injured and not ready to return to work, Bayfront was going "to proceed with interviewing some other candidates for [Ozorowsky's] position." (Doc. # 49-5). As mentioned in previous sections, the Court acknowledges that there are genuine disputes over the meaning of this voicemail and what happened during Ozorowsky's September visits to Bayfront. However, when crediting Ozorowsky's version of events, the voicemail and Ozorowsky's visits to Bayfront in September to return to work could lead a reasonable jury to conclude that Bayfront perceived Ozorowsky as disabled. Likewise, a reasonable jury could also conclude this perceived disability involved the major life activity of walking and this perceived disability would be substantially limiting given that PASR positions involved a good deal of walking. (Pl. Dep. Doc. # 52-3 at 34:20-25).

Additionally, Bayfront argues that Ozorowsky "cannot prove, under the 'but for' standard, that he was discriminated against because of his" perceived disability. (Doc. # 48 at 13). True, Ozorowsky testified that he did not "think [his treatment by Arbogast] was because of the injury." (Pl. Dep. Doc. # 52-3 at 110:13-17). And Bayfront highlights that,

27

according to its paperwork, Ozorowsky remained on LOA status until September 2020 when all Bayfront employees were terminated as part of Bayfront's sale to another company. (Arbogast Decl. Doc. # 49-8 at ¶ 17).

But, despite this evidence, a reasonable jury could conclude that Bayfront kept Ozorowsky on unpaid LOA status in September 2019 when Ozorowsky repeatedly requested to return to work because of his disability. Under Ozorowsky's version of the September 12 meeting with Arbogast and Sandt, the only jobs he was offered by Arbogast were nursing positions for which he was not qualified. A jury could conclude that Arbogast intentionally did not offer Ozorowsky, who had recently informed them he was injured and who was limping, a job that he could accept.

Also, given these disputes about whether Bayfront kept Ozorowsky on an unpaid LOA against his wishes, at least in September 2019, the Court rejects Bayfront's argument that Ozorowsky cannot show pretext. As mentioned previously, Bayfront's pretext argument focuses on its assertion that Ozorowsky requested additional time off in September 2019 and that the only adverse employment action was his ultimate separation from employment in September 2020, rather than his

remaining on an unpaid LOA status. (Doc. # 48 at 28-29). The Court rejects these arguments.

In short, Ozorowsky's ADA and FCRA disability discrimination claims survive summary judgment to the extent they are based on the "regarded as" theory of discrimination.

### 5.  <u>Retaliation under ADA and FCRA</u>

Ozorowsky alleges that Bayfront retaliated against him for engaging in protected activity under the ADA and FCRA in Counts VI and VII. Bayfront argues that summary judgment should be granted on these claims because (1) "there is no 'but for' causation between his protected expression and alleged failure to reemploy" because Ozorowsky requested more time off from work during the September 12 meeting and did not apply for any available position with Bayfront, and (2) "more than a year separated Ozorowsky's request for accommodations and his administrative separation due to the sale of Bayfront," "further negat[ing] any evidence of 'but for' causation." (Doc. # 48 at 16-17).

The <u>McDonnell Douglas</u> burden-shifting framework applies to ADA and FCRA retaliation claims. <u>See</u> <u>Duble v. FedEx Ground Package Sys., Inc.</u>, 572 F. App'x 889, 895 (11th Cir. 2014)("We evaluate ADA and FCRA retaliation cases under the framework set forth in [<u>McDonnell Douglas</u>].")."The ADA prohibits

retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016)(quoting 42 U.S.C. § 12203(a)). "To prevail on [his] ADA retaliation claim, [Ozorowsky] must show that: (1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two." Id. (citation omitted). "The first element may be met by a request for a reasonable accommodation." Id. "The third element requires a showing of but-for causation." Id.

As for the first element of the prima facie case, Ozorowsky argues he engaged in protected activity when he requested extended leave during his August 24 call to Sandt while he was still in the Army. (Doc. # 54 at 13). As for the second and third elements, Ozorowsky focuses on Sandt's August 29 voicemail stating that Bayfront would no longer hold his job and the subsequent failure of Bayfront to assign Ozorowsky to a new position. (Id.).

Taking all the evidence in the light most favorable to Ozorowsky, the Court agrees with Ozorowsky. A reasonable jury could conclude that he was not returned to a position at Bayfront in early September in retaliation for his requesting an extended leave in late August because of his injuries.

Ozorowsky testified that he, in fact, did not request additional time off work during the September 12 meeting. Rather, according to him, he requested to return to work immediately but was not returned to his previous position and was only offered at that time nursing positions for which he was not qualified. This failure to reemploy him, leaving him on an indefinite unpaid LOA, occurred less than a month after Ozorowsky had initially asked for more time off in August 2019.

And, again, while a long period of time separated Ozorowsky's initial request for more time off in August 2019 and the official end of his employment in September 2020, this is not dispositive. A reasonable jury could conclude that Bayfront's keeping Ozorowsky on an unpaid LOA in September 2019 was itself adverse action. And this action is close in time with Ozorowsky's August 2019 request for additional time off, thereby establishing causation for his prima facie case.

As with the disability discrimination claims, the Court rejects Bayfront's argument that Ozorowsky cannot show pretext given the disputes about whether Bayfront kept Ozorowsky on an unpaid LOA against his wishes in September

31

2019. For these reasons, the Motion is denied as to Counts VI and VII.

### 6.   **Whistleblower Claim**

Finally, in Count VIII, Ozorowsky alleges Bayfront violated the FWA.

"The FWA provides that '[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.'" Graddy v. Wal-Mart Stores E., LP, 237 F. Supp. 3d 1223, 1226 (M.D. Fla. 2017)(quoting Fla. Stat. § 448.102(3)). "To prove a prima facie case under this provision, [Ozorowsky] must establish that: (1) [he] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse employment action was causally linked to the protected activity." Id. (citation omitted). "If [Ozorowsky] presents a prima facie case, the burden shifts to [Bayfront] to articulate a legitimate non-retaliatory reason for its adverse employment action." Id. "Then, if [Bayfront] meets its burden, the burden shifts back to [Ozorowsky] to establish that [Bayfront's] articulated reasons are pretextual." Id.

Bayfront argues that summary judgment should be granted on this claim based on a lack of protected activity: "Because Ozorowsky admittedly did not complain about, object to, or refuse to participate in anything at all — but only discussed his military leave and reemployment options with, delivered his military orders to, and disclosed, without particulars, his injury to, Bayfront — he cannot prove objection or complaint about any actual violation of a law, rule, or regulation attributable to Bayfront, and cannot prove a statutorily protected act." (Doc. # 48 at 19). In making this argument, Bayfront relies on Ozorowsky's deposition testimony:

> Q:   Did you verbally or in an email or text, you personally, did you ever say to anybody at the hospital what you're doing is a violation of USERRA or some kind of other legal violation?
>
> A:   Not by text or by phone.
>
> Q:   In any other medium?
>
> A:   Outside of the course of my leadership, that was not talked about with anyone at Bayfront.

(Pl. Dep. Doc. # 52-3 at 167:19-168:1).

The Court disagrees with Bayfront. In his declaration, Ozorowsky avers that he told Arbogast during the September 12 meeting "that [he] had the right to [his] job under USERRA," which a reasonable juror could interpret as an objection to

Bayfront's failure to immediately return Ozorowsky to an equivalent position. (Pl. Decl. Doc. # 54-3 at ¶ 15). Furthermore, a reasonable juror could interpret Ozorowsky's notifying his Army recruiter in April 2019 of his disagreement with Sparr over whether his job was protected and having his Army recruiter contact Sparr regarding Ozorowsky's USEERRA rights as protected activity. (Pl. Dep. Doc. # 52-3 at 177:8-178:1; Doc. # 52-2 at Ex. 3). Given the existence of these protected activities, the Court need not evaluate whether Ozorowsky's other actions constitute protected activity under the FWA.

To the extent Bayfront also argues in a footnote that Ozorowsky cannot establish causation because he was not separated from employment for at least ten months after his alleged protected activity (Doc. # 48 at 19 n.27), this argument fails for the reasons discussed in previous sections. Being kept on an unpaid LOA may qualify as an adverse action and there is a much closer proximity between Ozorowsky's various protected activity and his being kept on LOA status after his military training ended.

As with the previous claims, the Court rejects Bayfront's argument that Ozorowsky cannot show pretext given

the disputes about whether Bayfront kept Ozorowsky on an unpaid LOA against his wishes in September 2019.

Ozorowsky's FWA claim survives the summary judgment stage.

## B. Ozorowsky's Motion

The same factual disputes that preclude summary judgment for Bayfront preclude summary judgment for Ozorowsky. There is conflicting evidence on various issues, including, among other things, whether Ozorowsky asked for more time off from work after his Army discharge and whether the jobs for which Bayfront encouraged Ozorowsky to apply paid less than his previous position or were otherwise not equivalent. Depending on how it views this and other evidence, a reasonable jury could find for Bayfront on any of Ozorowsky's claims.

Thus, Ozorowsky's Motion is denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant Bayfront HMA Healthcare Holdings, LLC's Motion for Summary Judgment (Doc. # 48) is **DENIED.**

(2)  Plaintiff Sequoyah Ozorowsky's Motion for Partial Summary Judgment (Doc. # 52) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 23rd day of August, 2021.

<u>VIRGINIA M. HERNANDEZ COVINGTON</u>
UNITED STATES DISTRICT JUDGE